Filed 8/25/21  P. v. Saucedo CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTIAN DAGOBERTO SAUCEDO,<br><br>    Defendant and Appellant. | B302706<br><br>(Los Angeles County Super. Ct. No. BA430049)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion in this matter filed on July 30, 2021, is modified as follows:

1.  On page 46, insert the word "perhaps" between "could" and "have," so that the sentence reads:

This circumstance could perhaps have established that Tovar was carrying a concealed firearm in violation of section

25400, an offense which is one of the enumerated crimes in section 186.22, subdivision (e).

2. On page 46, at the end of the first full paragraph that begins with the sentence "Nor can the People rely on the fact Saucedo admittedly knew Tovar was an MS-13 gang member, and had a firearm concealed in the truck, under the seat", *add the following text to the existing paragraph*:

More significantly, it is unclear how the jury would have known that firearm possession under these circumstances amounted to a crime. No evidence or instruction was offered on this issue. The prosecutor briefly argued that the firearm was possessed illegally, but—as the jury was instructed—an attorney's argument is not evidence. (CALCRIM Nos. 222 ["Nothing that the attorneys say is evidence"]; 200 [jury must decide what the facts are based only on the evidence presented at trial].) While it may be unlikely that a group of MS-13 gang members would be in lawful possession of a firearm under these circumstances, this mere assumption is not evidence.

3. On page 47, before the paragraph that begins with the sentence "Because the evidence was insufficient, the conviction must be reversed and the matter remanded for a full resentencing," *insert the following new paragraphs*:

In a petition for rehearing, the People argue that this analysis is contrary to *People v. Castenada* (2000) 23 Cal.4th 743 and *People v. Carr, supra*, 190 Cal.App.4th 475. Those cases, the People assert, "hold that section 182.5 does *not* require knowledge of specific types of predicate offenses to satisfy the element that appellant knew of the gang's pattern of criminal activity."

Apart from the fact that the People neglected to mention either case in their original brief, these authorities do not stand for the proposition the People assert. Neither case addressed section 182.5. At issue in *Castenada* was the substantive crime of active gang participation pursuant to section 186.22, subdivision (a). Like section 182.5, section 186.22, subdivision (a) requires as an element that the perpetrator know of the gang's pattern of criminal gang activity. (§ 186.22, subd. (a).) But *Castenada* did not address the knowledge element; instead, it considered the requirements of the "active participation" element of the crime. (See *Castenada*, at p. 746 ["At issue here is the meaning of . . . 'actively participates.' "].) The court concluded that the evidence was sufficient to show the defendant's gang involvement was "more than nominal or passive." (*Id.* at pp. 752–753.) It did not consider whether the evidence was sufficient to prove the knowledge requirement. Cases are not authority for propositions not considered (*People v. Baker* (2021) 10 Cal.5th 1044, 1109), and *Castenada* does not assist the People.

*People v. Carr* considered the sufficiency of the evidence to prove a section 190.2, subdivision (a)(22) special circumstance. Section 190.2, subdivision (a)(22) provides for death or life imprisonment without the possibility of parole if the "defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of section 186.22, and the murder was carried out to further the activities of the criminal street gang." The trial court gave CALCRIM No. 736, which included a requirement that the defendant knew the members of the gang engaged in a pattern of criminal gang activity. (*People v. Carr*, *supra*, 190 Cal.App.4th at p. 486.) *Carr* held that, despite the instruction's language, "on its

3

face section 190.2, subdivision (a)(22), does not expressly impose a knowledge requirement.  Instead, the wording of this provision requires only that the People prove Carr was an active participant in a criminal street gang when he murdered [the victims] and that the murders were carried out to further the activities of the gang." (*Ibid*.)  "Based purely on the statutory language . . . the People need not separately prove a defendant's subjective knowledge of the criminal activities of his or her fellow gang members to establish the section 190.2, subdivision (a)(22), special circumstance." (*Id.* at p. 487.)

Nonetheless, the court reasoned, as a matter of due process, before a defendant can be penalized for being an active participant in a criminal organization, it must be shown he knew of the "gang's criminal purposes." (*People v. Carr*, *supra*, 190 Cal.App.4th at p. 487.)  In that context, the evidence was sufficient to prove he knew of the gang's "criminal activities." (*Id.* at p. 488.)  He had admitted his membership in the Rollin' 20's Bloods gang, and been contacted by police in the company of another gang member.  There was an ongoing feud between his gang and the Eastside 20's that was reflected in local graffiti and had resulted in several shootings in the previous two years; he had a tattoo "proclaiming the Bloods over the Eastside 20's"; and he had been convicted of possessing cocaine base for sale. (*Id.* at p. 489.)  This evidence "was more than sufficient for the jury to infer Carr knew about the criminal activities" of the gang. (*Id.* at pp. 489–490.)  In a footnote, upon which the People here place much emphasis, the court construed the language used in CALCRIM No. 736—that the defendant knew that members of a gang engaged in or have engaged in a pattern of criminal gang activity—to "correlate to the active membership test described" in

4

*Scales v. United States* (1961) 367 U.S. 203, i.e., " ' "guilty knowledge and intent" of the organization's criminal purposes,' " and did "not require a defendant's subjective knowledge of particular crimes committed by gang members . . . ." (*Carr*, at p. 488, fn. 13.)

As is readily apparent, *Carr* was not concerned with the language of section 182.5, which—unlike section 190.2, subdivision (a)(22)—expressly requires that the defendant have "knowledge that [the gang's]  members engage in or have engaged in a pattern of criminal gang activity, *as defined in subdivision (e) of Section 186.22.*" (Italics added.)  Instead, *Carr* considered the type of knowledge necessary to satisfy due process, rather than a specific statutory requirement.  Its holding, therefore, cannot be grafted onto interpretation of section 182.5.

Indeed, if reference to statutes other than section 182.5 is useful, *People v. Robles* (2000) 23 Cal.4th 1106, provides a superior analogy.  There, the court considered former section 12031, subdivision (a)(2)(C), which elevated the misdemeanor offense of carrying a loaded firearm in public to a felony when committed by an " 'active participant in a criminal street gang, *as defined* in subdivision (a) of Section 186.22[.]" (*Id.* at p. 1109.) Because section 186.22, subdivision (a) did not actually define "active participant in a criminal street gang," the question in *Robles* was whether former section 12031 simply required a showing of the "active participation" element of the section 186.22, subdivision (a) offense, or whether it required proof of *all* elements of that crime.  (*Robles*, at pp. 1111–1112, 1114.)  *Robles* concluded the latter.  (*Id.* at p. 1115.)

At Robles's preliminary hearing, the People presented evidence that he had been observed standing with a group of persons wearing gang attire and threw a gun into a planter. He thereafter admitted to his gang membership in the La Mirada Locos. A detective testified that members of that gang had committed a series of armed robberies a month before defendant's arrest, and the previous year two members of the gang had stabbed a high school student on a bus. The detective had no reason to believe defendant knew of these incidents. (*People v. Robles*, *supra*, 23 Cal.4th at pp. 1109–1110.) *Robles* found this evidence insufficient. The court reasoned: "At defendant's preliminary hearing on the felony charge of carrying a loaded firearm in public, the prosecution presented evidence that defendant was a member of a criminal street gang, La Mirada Locos. But the prosecution presented no evidence of the other requirements of section 186.22(a): 'knowledge that its members engage in or have engaged in a pattern of criminal gang activity' and 'willfully promot[ing], further[ing], or assist[ing] in any felonious criminal conduct by members of that gang.' (§ 186.22(a).) Accordingly, as the magistrate at the preliminary hearing ruled, the prosecution failed to establish the requirement in section 12031(a)(2)(C), under which defendant was charged, that defendant was 'an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22.'" (*Robles*, at p. 1115.)

Thus, under *Robles*, the facts that a defendant is a gang member and the gang recently committed crimes are not sufficient to establish the section 186.22, subdivision (a) knowledge requirement—the same requirement at issue in section 182.5—absent evidence he knew of those crimes.

Respondent's petition for rehearing filed on August 13, 2021, is denied. There is no change in the judgment.

_____

EDMON, P.J.              EGERTON, J.              THOMAS, J.[*]

_____

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTIAN DAGOBERTO SAUCEDO,<br><br>    Defendant and Appellant. | B302706<br><br>(Los Angeles County<br>Super. Ct. No. BA430049) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed in part and reversed in part; remanded for further proceedings.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Amanda V. Lopez and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Christian Dagoberto Saucedo of second degree murder and criminal street gang conspiracy, with gang and firearm enhancements. After passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), the trial court reduced the murder conviction to assault with a firearm. Saucedo argues: (1) the trial court's admission of his confession violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and his trial counsel provided ineffective assistance by failing to adequately move to exclude it; (2) the evidence was insufficient to prove the criminal street gang conspiracy charge and the gang enhancement; (3) the prosecutor committed prejudicial misconduct in closing argument; (4) the trial court impermissibly interfered with the jury's deliberations; (5) the cumulative effect of the purported errors requires reversal; (6) a Penal Code section 12022, subdivision (a)(1)[1] firearm enhancement must be stricken because it was not properly pled; (7) the trial court committed sentencing error; (8) the record must be amended to correct various clerical errors; and (9) the trial court's calculation of custody credits was incorrect.

We reverse Saucedo's conviction for criminal street gang conspiracy and the related firearm enhancement and remand for resentencing, correction of the abstract of judgment, and recalculation of custody credits. In all other respects, we affirm the judgment.

---

[1] All further undesignated statutory references are to the Penal Code.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Facts*

Saucedo, Otoniel Tobar, Kevin Alvarado, and Carlos Ruiz were members of the Mara Salvatrucha criminal street gang (MS-13). They went by the monikers Suspect, Garrobo, Demo, and Fugitivo, respectively. The intersection of Wilshire Boulevard and Western Avenue borders territories claimed by both MS-13 and the rival 18th Street gang. The victim, Bryan Rubio, belonged to the Moteros gang.

a. *People's evidence*

(i) *The murder*

On September 21, 2014, at approximately 1:00 a.m., Rubio, along with other persons, was waiting at a bus stop at Wilshire and Western. According to the testimony of six eyewitnesses, considered together,[2] a dark-colored Silverado pickup truck stopped at a red light by the bus stop. Rubio and "some young guys" in the truck exchanged hand gestures. Rubio raised his middle finger in a disrespectful gesture. The truck turned around the corner. Rubio said to the person seated next to him, "Something is about to pop off."

Two men, identified by other evidence as Alvarado and Saucedo, walked to the bus stop from the direction of the truck. Someone, presumably Rubio, said either "Everything's good, man" or "Is everything good crazy?" Rubio held both hands up at chest height, with his palms out. Alvarado produced a gun, racked it, and fired numerous shots at Rubio, who was backing up, from approximately eight feet away. Saucedo stood

---

[2] We harmonize the eyewitnesses' testimony in the light most favorable to the judgment. (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303–1304.)

3

approximately four feet away from Alvarado and watched. Rubio fell on top of a woman who was selling tamales, and they both landed on the ground. Alvarado shot Rubio in the head. Saucedo and Alvarado then ran northbound on Western, to where the Silverado was stopped just before Sixth Street. They jumped in the truck, which drove southbound on Western again.

Rubio suffered gunshot wounds to his head and back, and died at the scene.

(ii) *The investigation*

No weapons were found at the bus stop. An open knife was discovered inside Rubio's pocket, but there was no evidence Rubio had it or another weapon in his hands when he was shot. The revolver used in the shooting was not recovered. None of the eyewitnesses was able to identify the assailants.

Surveillance videos taken from cameras located on Western Avenue showed a dark-colored truck drive southbound on Western at approximately 1:00 a.m. on the night of the shooting, and again at approximately 1:04. a.m. At 1:06 a.m., the video showed Saucedo and Alvarado running northbound on Western. At 1:07 a.m. the truck drove southbound again.

A police car that was in the area of the shooting at approximately 1:00 a.m. was equipped with a license plate recognition (LRS) camera. It recorded a dark-colored Silverado truck travelling on Western at 1:02 a.m. The vehicle's license plate number was traced to Tobar's estranged wife, at Tobar's address in Inglewood. Tobar was identified as a suspect and his cellular telephone was examined pursuant to a warrant. Through examination of his phone records, police identified other suspects, including Saucedo. Both Tobar's and Saucedo's cellular

4

telephones contained numerous photos depicting them with MS-13 graffiti or throwing MS-13 gang signs.

(iii) *Saucedo's statements to police*

Detectives interviewed Saucedo in November 2014. Saucedo stated that Tobar drove him, Ruiz, Alvarado, and Alvarado's female friend, a woman known as "Blackie," to Koreatown in Los Angeles. When stopped at a red light, they observed a man at a bus stop at Wilshire and Western. Ruiz exchanged words with the man and threw an MS-13 gang sign. Blackie, Alvarado, and Ruiz suggested they turn around and beat the man up. The truck circled around and passed the bus stop a second time. Tobar stopped the truck nearby the bus stop.

Blackie gave Saucedo her white sweater and told him to put it on. He did. He also wore a cap to cover his face. Saucedo and Alvarado exited and approached the victim at the bus stop. Alvarado was carrying a revolver. Alvarado asked if Rubio was from the 18th Street gang. Rubio said "Eighteen," Alvarado said "MS," and Alvarado fired multiple shots at Rubio. Saucedo claimed that as soon as he saw the gun or heard the first shot he ran back to the waiting truck. Saucedo knew that Tobar had a gun in the truck under the front passenger seat. He did not know that Alvarado had it on his person when they approached the bus stop. Saucedo believed they were just going to fight the victim, not kill him; there were too many people at the bus stop.

After Alvarado returned to the truck, Tobar drove the group around the block again and Saucedo saw the victim on the ground. Alvarado said he shot Rubio because he thought Rubio was about to pull out a weapon. Saucedo did not see the victim holding a knife or other weapon.

The group then went to the beach and, either that night or the next day, took photographs of persons in the group throwing gang signs.

(iv) *Gang evidence*

Los Angeles Police Department Officer Daniel Jara testified as the People's gang expert, as follows. MS-13 is one of the largest gangs in the world, and one of the biggest gangs in the United States. MS-13 started in Los Angeles in the 1980's, and then spread throughout the country and into Central America. In Los Angeles, the gang has approximately 700 members or affiliates. Throughout the world, the gang has numerous subsets or cliques. In Los Angeles, over 10 such cliques exist, differentiated by area. A clique usually takes the name of a major street in the neighborhood, often followed by "Locos." One of MS-13's main gang rivals in Los Angeles is the 18th Street gang. Western and Wilshire, where the shooting occurred, sits at the border shared by the two gangs, and is a "hot spot."

MS-13 identifies itself to the community through hand signs, tattoos, and graffiti. It uses a hand sign known as "the horns," as well as hand signs resembling "M" and "S." Tattoos displayed by MS-13 gang members may include these symbols. An MS-13 gang member is not allowed to obtain gang tattoos until he has done "something for the gang."

The MS-13 gang's primary activity is extortion, as well as firearm possession, robbery, narcotics sales, and vandalism. Gang members are required to "put[ ] in work," i.e. commit crimes, for the benefit of the gang. Jara testified regarding two

6

"predicate" crimes committed by MS-13 members.[3]  In the gang culture, one's reputation is of paramount importance.

When given a hypothetical based on the evidence in the case, Jara opined that such a shooting would be committed for the benefit of and in association with the gang.

Before the shooting, Saucedo had an "M" and an "S" on his fingers and "Dementes FLS Locos" on his hand.  After the shooting, Saucedo obtained additional MS-13 tattoos, including an "M" and an "S" on his chin, and an "M" on one leg and an "S" on the other.  On his head he had devil horns, "Fulton," and "MS"; because they were covered by his hair, it was unclear whether he got those tattoos before or after the shooting.  A gang member who gets additional gang tattoos after committing a crime indicates he is "proud about it" and is loyal to the gang.

b. *Defense evidence*

Saucedo presented the testimony of a gang expert, who testified as follows.  MS-13, like the Crips, Bloods, and Sureños, is an umbrella group with numerous distinct subsets that have their own leadership, territory, and rivalries.  Different MS-13 subgroups may have rivalries between themselves.  However, MS-13 qualifies as a gang within the meaning of section 186.22.

Western and Wilshire is not a "battlefront" territory of either MS-13 or the 18th Street gang; it is a business district.  The surrounding neighborhoods are gang territory.

It is frowned upon in gang culture to be "disrespected" and not take action, but in reality such instances often occur without incident.  However, such confrontations can result in violence, including a killing.

---

[3]    We discuss Officer Jara's testimony in more detail where relevant *post*.

Tattoos signify that a person was or is a gang member, but do not indicate a person's status within a gang, i.e. how "hard-core" they are or how many crimes they have committed.

Gang members talk to each other about their activities, but they do not necessarily know everything about the gang's activities, nor will they necessarily know what other cliques are doing. All members are not privy to every murder or crime committed by other gang members. Over the last five years in Los Angeles, MS-13 gang members have killed 18th Street gang members, and vice versa.

When given a hypothetical, the expert opined that the shooter could have acted either from a gang motive or because of a perceived threat. The person who accompanied him, however, did not participate in the shooting, had no chance to play a role, and did nothing to "fully back the [shooter] up."

2. *Procedure*

Trial was by jury. Saucedo was convicted of second degree murder (§ 187, subd. (a)) and criminal street gang conspiracy (§ 182.5). The jury found a principal armed enhancement true as to both offenses (§ 12022, subd. (a)(1)), and found a gang enhancement and a section 12022.53 firearm enhancement true as to the murder charge (§§ 186.22, subd. (b), 12022.53, subds. (d), (e)(1)). It acquitted Saucedo of first degree murder.

Saucedo was not sentenced until 2019. In September 2019, the trial court granted Saucedo's motion, pursuant to section 1170.95 and Senate Bill 1437, for vacation of his murder conviction. On the criminal gang conspiracy charge, it sentenced Saucedo to 15 years to life, plus one year. On count 1, it sentenced Saucedo on the redesignated target offense of assault with a firearm to the high term of four years, plus five years for

8

the section 186.22 gang allegation, to run concurrently with the sentence on count 2.

Saucedo filed a timely notice of appeal.

## DISCUSSION

1. *Alleged* Miranda *violations*

    a. *Additional facts*

        (i) *Saucedo's police interview*

As noted, after Saucedo's arrest Detectives Rodriguez, Bowen, and Vinton conducted a videotaped interview of Saucedo at a police station. At the outset, Saucedo's handcuffs were removed and he was offered water. After ascertaining that Saucedo preferred to converse in Spanish, Detective Rodriguez—who was fluent in that language—asked questions. Rodriguez explained, "I'm going to take your information and then I'm going to also ask you some questions, okay?" Rodriguez then asked for Saucedo's name, birthdate, and address.

Rodriguez also asked to see Saucedo's tattoos, and Saucedo displayed them as requested. Most were non-gang-related. Some were the names of Saucedo's family members, including his brother, Alan. Saucedo explained that five years previously, in Guatemala, unnamed assailants had shot at him and his brother, killing Alan. Detective Vinton observed that Saucedo had an "M" and an "S" on his hands, and Rodriguez asked what they were. Saucedo replied that they stood for his parents' initials, and had been inked while he was still in Guatemala. Vinton replied, "Mara," and Rodriguez said Saucedo was lying.

Rodriguez then said he already knew what had happened, "So I will be checking if you're lying to me. Since you're telling me it's an "M" and an "S," I already know what they are, okay? You're from Mara, correct?" Saucedo answered affirmatively.

Saucedo also admitted, in response to the detective's questions, that he had been a member of the gang for three months and was part of the FLS, or Fulton, clique.  His moniker was "Sospechoso" ("Suspect").  Rodriguez asked how he had come to join the gang, and why.  Saucedo responded, "through friends," and because "every young person wants to experiment with [life.]"

Saucedo also answered further questions regarding his education, age, phone number, birthplace, employment, family, and arrival date in the United States.

Rodriguez then stated, "We're going to ask you some questions.  Before I ask you these questions, I'm going to read you some rights that you have" and "when I read this to you, please, if you don't understand what I'm telling you: 'Detective, wait, explain this part to me.'  And I will explain it to you."  Saucedo responded, "Okay."  Rodriguez then informed Saucedo of his *Miranda* rights, that is, his right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney free of charge.  As to each right, Saucedo indicated he understood.[4]

---

[4]      The colloquy was as follows:
"[Rodriguez]: You have the right to remain silent; do you understand?
"[Saucedo]: Okay.
"[Rodriguez]: Is that a yes?
"[Saucedo]: Yes.  Yes, I understand.
"[Rodriguez]: Anything you say can be used against you in a court of law, do you understand?
"[Saucedo]: Yes.
"[Rodriguez]: You have the right to have an attorney present before and during this questioning, do you understand?
"[Saucedo]: Yes.

Rodriguez confirmed Saucedo's gang membership and moniker. He reiterated, "Like I'm telling you, many of the questions I will be asking you, I already know the answers," and stated that if Saucedo started lying to him, *"you're going to dig a deeper hole for yourself. So I need the entire truth from you."* (Italics added.)

At that point, the detectives began questioning Saucedo about the murder. Saucedo admitted knowing and spending time with MS-13 member Tobar, whom he knew to be in custody. Rodriguez said, "That's why we are here" and asked about the visit to the beach. Saucedo initially said he went dancing and then went to the beach with Tobar, Ruiz, someone named "Espanto," and some girls, in Tobar's white truck.

Rodriguez then asked directly about the murder. Rodriguez told Saucedo that Tobar and "other people" were already in custody, and Saucedo's name did not "fall from the sky." Saucedo's phone records showed he was "right there" and "with these other guys." The following exchange transpired:

> "[Rodriguez]: What happened?
> "[Saucedo]: But let me tell you something.
> "[Rodriguez]: Yeah.
> "[Saucedo]: I'm going to tell you the truth—the entire truth.
> "[Rodriguez]: Tell me the truth.
> "[Saucedo]: But it stays here.
> "[Rodriguez]: Yeah, this is between us. Tell me what happened.

---

"[Rodriguez]: If you don't have the money to pay for an attorney, one will be named for you, free of charge, before any questioning, do you understand?
"[Saucedo]: Yes."

"[Saucedo]: Okay.

"[Rodriguez]: Me, this guy, and you.

"[Saucedo]: Okay.

"[Rodriguez]: *But if you're going to lie to me, keep in mind I've already spoken with . . . three or four people.  I already know what happened.  Now I want to hear what you—.  I already know you were there and that all this stuff happened.  So, what I want from you is the truth.  If you're going to lie to me, you will remain in here forever, okay?*

"[Saucedo]: Yes."  (Italics added.)

Saucedo began to describe the group's excursion into Koreatown.  Saucedo asked, "They've already told you, right?" Rodriguez replied, "*No.  But that's why I'm telling you: I want to hear from you about what happened.  I want to hear about—.  In order to help you, you have to tell me what happened.*"  (Italics added.)  Saucedo replied, "Yeah."  Rodriguez continued, "I can't tell you what I know.  I want to know what you . . . The truth.  *Because if you're lying to me, I will know that you will be lying to me.*"  (Italics added.)

Saucedo subsequently described the circumstances of the murder, as recounted above.  Rodriguez asked why Saucedo did not go to the police, since he was not the shooter.  The following colloquy followed:

"[Saucedo]: I couldn't [unintelligible] from the gang.

"[Rodriguez]: Is that because the gang says not to?

"[Saucedo]: Yeah.  So I told you right now, please don't say anything.

"[Rodriguez]: I know.  I understand.

"[Saucedo]: Okay.

"[Rodriguez]: I understand.

"[Saucedo]: I don't want my family to have any problems because of all of that." Slightly later in the interview Saucedo confirmed that he could not call the police and did not want to talk because he was scared of the gang, and "that's the law of the gang."

(ii) *Motion to exclude post-*Miranda *statements*

Prior to trial, defense counsel moved to exclude the post-advisement portion of the interview on the ground Saucedo's statements were involuntary. Pointing to those statements italicized above, counsel argued Saucedo's admissions had been impermissibly elicited due to "threats" and a promise of leniency.

The trial court denied the motion. After watching the video of the interview, it concluded that the detectives' demeanor was nonthreatening and nonintimidating. In context, there was no implied promise and the comments in question did not render Saucedo's statements involuntary.

The court then asked whether the defense wished to challenge the pre-advisement portion of the interview insofar as it constituted interrogation and Saucedo had made statements about his gang membership and tattoos. Defense counsel replied that he recognized the pre-advisement statements could be challenged, but "after evaluating all the evidence in this case and the facts of this case, I am making a tactical decision not to seek to exclude the pre-*Miranda* statements."

13

b. *Discussion*

(i) *Applicable legal principles*

To "safeguard a suspect's Fifth Amendment privilege against self-incrimination," a custodial interrogation[5] must be preceded by *Miranda* warnings[6] and by the suspect's knowing and intelligent waiver of them. (*People v. Leon* (2020) 8 Cal.5th 831, 842–843; *People v. Elizalde* (2015) 61 Cal.4th 523, 530–531 (*Elizalde*).) The prosecution must show, by a preponderance of the evidence, that the defendant's waiver was valid and the statements were voluntary. (*People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*); *People v. Dykes* (2009) 46 Cal.4th 731, 751.)

When reviewing a trial court's ruling on a claimed *Miranda* violation, if an interview is recorded and the facts surrounding the admission are undisputed, we apply independent review. (*People v. Leon, supra,* 8 Cal.5th at p. 843; *People v. Peoples* (2016) 62 Cal.4th 718, 740; *Elizalde, supra,* 61 Cal.4th at p. 530.) A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in the prosecution's case-in-chief. (*Elizalde,* at p. 527; *Krebs, supra,* 8 Cal.5th at p. 299.) Issues relating to the suppression of statements made during a

---

[5] The parties do not dispute that the November 13, 2014 interview at the police station constituted a custodial interrogation.

[6] " '*Miranda* prescribed the following four now-familiar warnings: [¶] '[A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " (*Florida v. Powell* (2010) 559 U.S. 50, 59–60.)

14

custodial interrogation are evaluated under federal constitutional standards.  (*People v. Flores* (2020) 9 Cal.5th 371, 416.)

(ii)  *Admission of Saucedo's pre-advisement statements*

Saucedo contends the trial court should have excluded the pre-advisement portion of the interview because the questions about his tattoos and gang membership, asked before he was advised of his rights, violated *Miranda.*  (See *Elizalde, supra,* 61 Cal.4th at p. 538 [unwarned answers to questions about gang affiliation were likely to elicit incriminating information, and therefore were inadmissible].)

But defense counsel expressly declined to seek exclusion of Saucedo's pre-advisement statements.  Accordingly, his challenge to this portion of the interview has been forfeited and any error was invited.  (Evid. Code, § 353, subd. (a); *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision"]; *People v. Holt* (1997) 15 Cal.4th 619, 666 ["The rule requiring specificity applies to *Miranda*-based objections and motions to exclude."]; *People v. Rundle* (2008) 43 Cal.4th 76, 121, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. Bailey* (2012) 54 Cal.4th 740, 753 [" 'If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' "]; *People v. Cooper* (1991) 53 Cal.3d 771, 831 ["Error is invited if counsel made a conscious tactical choice."].)

Saucedo attempts to overcome this hurdle by asserting that his counsel provided ineffective assistance.  To establish that

claim, a defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance resulted in prejudice; that is, there is a reasonable probability that, but for counsel's failings, defendant would have achieved a more favorable result. (*People v. Bell* (2019) 7 Cal.5th 70, 125; *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.) We accord great deference to counsel's tactical decisions and presume that counsel's actions were reasonable and can be explained as a matter of sound trial strategy. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *In re Gay* (2020) 8 Cal.5th 1059, 1073.) We will reverse a conviction based on ineffective assistance grounds only if there is affirmative evidence that counsel had no rational tactical purpose, was asked for a reason and failed to provide one, or there could be no satisfactory explanation. (*Mickel*, at p. 198; *People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

Here, counsel's tactical purpose is readily apparent. During closing argument, he urged the jury to consider many of the facts disclosed in the pre-advisement portion of the interview. He argued that while in Guatemala, Saucedo and his brother had been shot at and his brother killed; thereafter his parents sent Saucedo to the United States for a better life; he managed to get a job and pay for his own housing, "quite an accomplishment for an 18-year-old kid to come to a different country"; his family was still in Guatemala and he was in the United States "all alone"; and he likely was seeking out companionship. Counsel urged that the jury should not "demonize" Saucedo as a gang member, and should keep the foregoing in mind when determining "what Mr. Saucedo was thinking at different times, why he acted the way he did." As Saucedo did not testify, admission of the pre-

16

advisement portion of the interview was the only route by which counsel could introduce this biographical information.

And, counsel could reasonably have concluded that compelling evidence of Saucedo's gang membership and tattoos would be elicited even if the pre-advisement portion of the interview was excluded. Saucedo's MS-13 related tattoos (many of which were inked after the murder) would have been admissible even had the interview been excluded. (See *Elizalde*, *supra*, 61 Cal.4th at p. 532 [Fifth Amendment privilege against self-incrimination " 'does not protect a suspect from being compelled by the State to produce "real or physical evidence." ' "].) Numerous photographs extracted from Saucedo's phone showed gang-related graffiti, as well as Saucedo "throwing" MS-13 gang signs. One such photo was captioned "Christian Suspect Fulton Locos MSX3."

For the same reasons, even assuming arguendo that counsel's failure to challenge the pre-advisement portion of the interview was error, Saucedo has not demonstrated prejudice. The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) That test requires the People to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. (*Ibid.*) Because compelling evidence that Saucedo was an MS-13 gang member would have been before the jury even had the pre-advisement portion of the interview been excluded, Saucedo cannot demonstrate prejudice. (See *Elizalde*, *supra*, 61 Cal.4th at p. 542 [admission of defendant's pre-advisement statement that

17

he was a gang member was harmless where gang membership was convincingly established by other evidence].)

          (iii) *Validity of waiver and adequacy of* Miranda *advisements*

Saucedo further argues that he did not expressly or adequately waive his *Miranda* rights, and the advisements he received were inadequate because they were given in a manner that minimized their importance and were undercut by the detective's statement that their discussion was "between us."

The defense did not seek to exclude the interview on these grounds. They have therefore been forfeited. (See *People v. Gurule* (2002) 28 Cal.4th 557, 603 [claim that detective's statement that they would keep defendant's revelations " 'between us' " forfeited by failure to raise it in the trial court]; *People v. Linton* (2013) 56 Cal.4th 1146, 1170 [claim that *Miranda* waiver was not knowing or voluntary because detective promised his statements would not be used against him forfeited by failure to raise it in the trial court]; *People v. Polk, supra,* 190 Cal.App.4th at p. 1194; *People v. Holt, supra,* 15 Cal.4th at p. 666.) In any event, they lack merit.

        A. *Waiver*

"The prosecution . . . does not need to show that a waiver of *Miranda* rights was express." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.) "It is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's words and actions." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1269 ["a defendant's decision to answer questions after indicating that he or she

understands the *Miranda* rights may support a finding of implied waiver, under the totality of the circumstances."].)  " 'In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' " (*Parker*, at p. 1216; *Krebs*, *supra*, 8 Cal.5th at p. 302; *People v. Flores*, *supra*, 9 Cal.5th at p. 417; *People v. Lessie* (2010) 47 Cal.4th 1152, 1169.)

Such is the case here.  Detective Rodriguez advised Saucedo of each of his *Miranda* rights, and Saucedo confirmed he understood each.  Immediately thereafter, he began answering the detective's questions and gave no hint that he felt intimidated, wanted a lawyer, wished to terminate the interview, or wished to invoke his right to silence.  "Such conduct suggests that defendant 'has made a deliberate choice to relinquish the protection those rights afford.' " (*Krebs*, *supra*, 8 Cal.5th at p. 303.)  The advisements were given in Saucedo's native language, by a Spanish-speaking officer.  Nothing in the record suggests Saucedo had a diminished mental capacity or any impairment that would have prevented him from understanding the advisements.  (See *People v. Salcido* (2008) 44 Cal.4th 93, 128; *People v. Leon*, *supra*, 8 Cal.5th at p. 844 [California Supreme Court has "not decided that any particular intelligence or experience level is required to understand the *Miranda* warnings or to waive them"]; *People v. Lessie*, *supra*, 47 Cal.4th at p. 1169.)  Saucedo initially attempted to deceive the officers, telling them that Tobar had been driving a white truck, not a dark one, and that the group had gone dancing and then to the beach, omitting their foray into Koreatown.  His "attempt to

deceive the officers . . . indicates attentiveness and an awareness of his circumstances," tending to support a finding of a knowing and intelligent waiver.  (*Leon*, at p. 844.)

B.  *Adequacy of advisements*

Saucedo concedes that the advisements were "technically delivered correctly" and their form satisfied *Miranda.* Nonetheless, he argues that the warnings were "downplayed," "snuck in" among other questions, and given in a "casual . . . manner" that "trivialized" their significance and "ensured he would not take them seriously."  He also complains that the detectives did not make sure he actually understood "the concepts," as opposed to "the words."

We have reviewed the transcript and the video of the interview, and see nothing that would have undercut the significance of the advisements given.  The detective stated each right separately and asked, after each, whether Saucedo understood.  The fact the detective asked questions both before and after giving the *Miranda* advisements does not establish that they were delivered without sufficient gravity.  (Cf. *People v. Gurule, supra*, 28 Cal.4th at p. 602 [pre-interview banter did not suggest the *Miranda* warning "was jokingly delivered or was otherwise conveyed in a manner lacking the solemnity defendant argues such warnings require"].)  The advisements followed a standard format, and were not complex.  Immediately preceding the *Miranda* advisements, Detective Rodriguez told Saucedo, "And when I read this to you, please, if you don't understand what I'm telling you: 'Detective, wait, explain this part to me.' And I will explain it to you."  Saucedo never asked for a further explanation.  Nothing in the record suggests he failed to

20

comprehend the meaning or significance of the advisements.[7] (See *People v. Suarez* (2020) 10 Cal.5th 116, 158 [*Miranda* advisement adequate when defendant was advised of rights orally and in writing, said he understood, and did not have any questions].)

Saucedo also argues that the efficacy of the second advisement—that anything he said could be used against him in a court of law—was undermined by the detective's agreement that his account "stays here" and was "between us." Our

---

[7] The authorities Saucedo cites in support of his argument bear no factual resemblance to the instant matter. Unlike in this case, in *Commonwealth of Northern Mariana Islands v. Mendiola* (9th Cir. 1992) 976 F.2d 475, 481–483, overruled on another ground by *George v. Camacho* (9th Cir. 1997) 119 F.3d 1393, 1395, *Miranda* warnings were given in combination with a set of warnings about local statutory rights; together, the warnings were equivocal, contradictory, and open to misinterpretation. In *Cooper v. Dupnik* (1992) 963 F.2d 1220, 1223–1227, 1242, officers acted pursuant to a preconceived plan to knowingly violate the law by ignoring suspects' invocation of *Miranda* rights, thereby turning the advisements into a "farce." Nothing remotely similar occurred here. In *Wilson v. Lawrence County* (8th Cir. 2001) 260 F.3d 946, 952, a civil rights action, officers secured a confession from a mentally handicapped suspect who had difficulty distinguishing between fantasy and reality, and "could be talked into anything." During the interrogation, they promised leniency if he confessed, gave him false information about the evidence against him, and used leading questions and threatening tones and language. (*Wilson*, at pp. 952–953.) The suspect was unlikely to understand the *Miranda* advisements given due to his low intelligence. (*Id.* at p. 953.) Nothing in the record suggests Saucedo was mentally impaired, and the circumstances present in *Wilson* are worlds away from the interrogation here.

21

Supreme Court has rejected a similar contention. In *People v. Gurule*, a detective told a suspect that " 'what you tell us we're going to keep between us.' " (*People v. Gurule, supra*, 28 Cal.4th at p. 604.) The court recognized that, "If the police had actually promised defendant his statements would not be used against him, contrary to the earlier *Miranda* warning, an error of constitutional dimension would have occurred." (*Id.* at p. 603.) But the court found the detective's statements could not be so construed. The detective told the defendant other persons had blamed him for the crime, and Gurule denied responsibility. The detective responded that he could not disclose " 'what the other people have told us because, *what you tell us we're going to keep between us.* ' " (*Id.* at p. 604.) *Gurule* concluded that the record did not support the conclusion that the officers "made a promise to hold defendant's statement in confidence" (*id.* at p. 603), nor did it show that Gurule understood the comment to "vitiate the *Miranda* warning given just minutes earlier." (*Id.* at p. 604.)

Similarly, here, the detective's statement cannot be construed, in the context of the record as a whole, as a promise not to use the statements against Saucedo at trial. Other portions of the interview make plain that Saucedo's concern was with keeping his statements from his accomplices. Saucedo told detectives that he did not initially report the shooting "because the gang says not to," he was "scared of the gang," and he did not want his family to have any problems. In that context, he reiterated, "So I told you right now, please don't say anything." During closing argument, defense counsel acknowledged Saucedo's comment stemmed from his fear of the gang. Saucedo's concern thus related to retaliation by fellow gang members who might learn that he provided information to the police, not with

22

the use of his statements at a future trial. In this context, Detective Rodriguez was merely trying to assuage Saucedo's fears about implicating fellow gang members, not reneging on the advisement, given minutes before, that anything Saucedo said could be used against him in court. The detective's statement was not the equivalent of an assurance that the conversation would be " 'off the record.' " (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1037.)

(iv) *Purported police coercion and* Seibert *violation*

Saucedo next contends that his post-advisement statements should have been suppressed because they were the product of police coercion, including the detectives' use of the two-step interrogation process condemned in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*).

"Under [United States Supreme Court] precedent, the mere fact that a defendant has made unwarned admissions does not render subsequent warned confessions inadmissible." (*Krebs*, *supra*, 8 Cal.5th at p. 307; *Oregon v. Elstad* (1985) 470 U.S. 298, 314 (*Elstad*).) "Even when a first statement is taken in the absence of proper advisements and is *incriminating*, so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation." (*People v. Williams* (2010) 49 Cal.4th 405, 448; *Krebs*, at p. 307; *People v. Scott* (2011) 52 Cal.4th 452, 477.) "Absent 'any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will,' a *Miranda* violation—even one resulting in the defendant's letting 'the cat out of the bag'—does not 'so taint[ ] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.' "

(*Williams*, at p. 448, citing *Elstad*, at pp. 309, 311.) "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad*, at p. 314.)

In *Seibert*, the high court concluded this *Elstad* rule is inapplicable when an officer intentionally uses a two-step interrogation process in order to circumvent *Miranda*. (*Seibert*, *supra*, 542 U.S. at p. 604 (plur. opn. of Souter, J.).) There, "the high court confronted a situation where the interrogating officer 'made a "conscious decision" to withhold *Miranda* warnings.' " (*Krebs*, *supra*, 8 Cal.5th at p. 308.) An officer testified he had been taught, as an interrogation technique, to "question first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect] already provided once.' " (*Seibert*, at p. 606 (plur. opn.).)

Under these circumstances, a majority of the high court found the postadvisement confession inadmissible. (*Seibert*, *supra*, 542 U.S. at p. 604 (plur. opn.) & p. 618 (conc. opn. of Kennedy, J.); *Krebs*, *supra*, 8 Cal.5th at p. 308.) "The court fractured, however, on why that is so. A plurality of four justices explained that 'when interrogators question first and warn later' [citation], the later, warned confession is admissible only if 'in the circumstances the *Miranda* warnings given could reasonably be found effective.' [Citation.]" (*Krebs*, at p. 308.) The four-justice plurality concluded that, under the circumstances in *Seibert*, the warnings could not have served their purpose, and the postadvisement statements were inadmissible. (*Seibert*, *supra*, 542 U.S. at pp. 616–617 (plur. opn.).)

Justice Kennedy concurred in the judgment but rejected the plurality's proposed test as overbroad. (*Seibert*, *supra*, 542 U.S. at pp. 621–622 [conc. opn. of Kennedy, J.].) Instead, he concluded: "I would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622.) Under his approach, where the two-step strategy was *not* deliberately employed to circumvent or undermine the *Miranda* warnings, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." (*Ibid.*) Where a two-step strategy was deliberately used for tactical purposes, postwarning statements related to the substance of the prewarning statements must be excluded absent curative measures. Such measures may include a substantial break in time and circumstances between the unwarned statements and the *Miranda* warning, or an additional explanation that the earlier statements are likely inadmissible at trial. (*Seibert*, at p. 622.)

"The fractured nature of *Seibert* has given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling standard," with the substantial majority of federal circuit courts concluding that Justice Kennedy's approach is the proper test. (*Krebs*, *supra*, 8 Cal.5th at p. 309 [listing federal authorities].) Our Supreme Court, in *Krebs*, declined to decide the question, because in that case "the result . . . would be the same under either approach." (*Ibid.*)

Applying this analytical framework, we must first determine whether Saucedo's pre- and post-advisement statements were voluntary. (See *People v. Camino* (2010) 188

Cal.App.4th 1359, 1363–1364.)**[8]** If so, under *Elstad*, they are admissible unless they ran afoul of *Seibert*. To make that second determination, applying Justice Kennedy's approach, we consider whether the detectives deliberately withheld the *Miranda* warnings in a calculated attempt to undermine *Miranda*'s efficacy, and, if so, whether sufficient curative measures were taken. Alternatively, applying the *Seibert* plurality's approach, we must determine whether it is reasonable to conclude that the tardy warnings could function as effectively as *Miranda* requires.

## A. *Voluntariness*

"In determining whether the prosecution met its burden of establishing by a preponderance of the evidence that defendant's confession was voluntary, we consider the totality of the circumstances. [Citation.] '[N]o single factor is dispositive. [Citation.] The question is whether the statement is the product of an " 'essentially free and unconstrained choice' " or whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " by coercion.' [Citation.]" (*People v. Flores*, *supra*, 9 Cal.5th at p. 426.) The factors to be considered include "any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health." (*People v. Suarez*, *supra*, 10 Cal.5th at p. 157; *People v. Peoples*, *supra*, 62 Cal.4th at p. 740.) Our Supreme Court has "found a confession not 'essentially free' when a suspect's confinement was physically oppressive, invocations of his or her

---

**[8]** Of course, an involuntary confession may not be introduced into evidence even where a *Seibert* violation is not at issue. (See, e.g., *People v. Spencer* (2018) 5 Cal.5th 642, 672; *People v. Linton*, *supra*, 56 Cal.4th at p. 1176.)

26

*Miranda* rights were flagrantly ignored, or the suspect's mental state was visibly compromised." (*People v. Spencer*, *supra*, 5 Cal.5th at p. 672.)

The trial court's conclusion that Saucedo's statements were not involuntary is supported by the evidence. The interview was not protracted, lasting slightly less than an hour and a half. (See *People v. Linton*, *supra*, 56 Cal.4th at p. 1178 [interviews of two and a quarter hours did not "reflect the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary"].) The portion of the interview that preceded the *Miranda* advisements was shorter still, lasting only approximately nine minutes. Saucedo's handcuffs were removed before the interview started, and he was offered water. At 23 years old, Saucedo was an adult. The record gives no reason to suspect he was suffering from any physical or mental disability, or that his mental acuity was lacking. He responded to questions cogently and without apparent difficulty, and did not appear distressed. (See *People v. Spencer*, *supra*, 5 Cal.5th at p. 673.) He "had the wherewithal to articulate . . . a version of events that minimized his involvement" (*ibid.*), stating that he had no idea the victim would be shot and—in contradiction to the video of him and Alvarado running from the scene—that he fled immediately upon seeing the gun.

The detectives did not employ improper interrogation tactics. The trial court found the detectives' demeanor was not threatening or demeaning, and we agree. As Saucedo appropriately acknowledges, the detectives were conversational and cordial. (See *People v. Linton*, *supra*, 56 Cal.4th at p. 1178.) He does not claim any physical intimidation or deprivation and makes " 'no assertion of coercive tactics other than the contents of

27

the interrogation itself.' " (*People v. Spencer, supra,* 5 Cal.5th at p. 672; *People v. Suarez, supra,* 10 Cal.5th at p. 161.) The detectives "engaged in no name-calling, no obvious strong-arm tactics, and no base appeals to [defendant's] deeply held beliefs." (*Spencer*, at p. 673.) Saucedo did not make, and the detectives did not ignore, any invocation of his rights. Although the record is not entirely clear, it appears Saucedo had at least one prior run-in with the police, related to a domestic violence arrest. In any event, lack of experience with the criminal justice system does not, by itself, invalidate a *Miranda* waiver or render subsequent statements involuntary. (*Suarez*, at p. 161.) The record does not reveal much about Saucedo's education, but he told the detectives that he had been attending school to learn English. In short, nothing suggests Saucedo lacked sufficient education, intelligence, or maturity to voluntarily give his account of what happened.

Saucedo repeatedly stresses that he came to the United States from Guatemala, characterizing himself as a "newly minted immigrant" who spoke little English. To the contrary, Saucedo told detectives he had been in the United States for four and a half or five years. The interview was conducted in Spanish at Saucedo's request, so the fact he was not a native English speaker does not suggest involuntariness.

Although Saucedo insists he was "cowed into submission through threats about lying," the record does not bear this out. Detective Rodriguez stated several times that he already had information about what had transpired, would know if Saucedo was lying, and wanted the truth. But these statements were neither deceptive nor coercive. The detectives did, in fact, have information about what had transpired. And it is not coercive to

28

exhort a suspect to tell the truth.  (See *People v. Spencer, supra,* 5 Cal.5th at p. 674 [repeated assertions that police knew suspect was lying did not rise to the threshold necessary to taint the interrogation as unlawful]; *Krebs, supra,* 8 Cal.5th at p. 306; *People v. Young* (2019) 7 Cal.5th 905, 925 [mere exhortation by police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not render subsequent confession involuntary].)  "Officers are permitted to encourage a subject to talk and to challenge statements as untrue." (*People v. Henderson, supra*, 9 Cal.5th at p. 1024.)  The detective's fleeting statement that if Saucedo lied he would remain "in here" forever, was, as the trial court found, too vague to amount to a threat.  Statements about potential consequences arising from a crime are generally not coercive. (See *People v. Orozco* (2019) 32 Cal.App.5th 802, 820 ["Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes"]; *Spencer*, at p. 675 [constitutional violation will be found only where a confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a promise of leniency in exchange for cooperation].)  The detective's brief statement, "In order to help you, you have to tell me what happened," was not an implied promise of leniency.  It cannot reasonably be construed as a promise that if Saucedo cooperated, he would not be prosecuted or convicted for the murder.  (See, e.g., *Krebs, supra,* 8 Cal.5th at pp. 305–306; *People v. Carrington* (2009) 47 Cal.4th 145, 174.)

In sum, we find no evidence that Saucedo's will was overborne in either the pre- or post-advisement portions of the interview.

29

B. *The alleged* Seibert *violation: Justice Kennedy's approach*

Having found the statements were voluntary, we turn to the question of whether the detectives violated *Seibert*. First, applying Justice Kennedy's approach, we consider whether " 'objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning.' [Citation.] 'Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre-and postwarning statements.' [Citation.]' " (*People v. Camino, supra*, 188 Cal.App.4th at p. 1370.)

We see nothing in the record indicating the detectives intentionally withheld *Miranda* warnings as a calculated interrogation technique. Because Saucedo did not make his *Seibert* challenge below, the relevant facts have not been developed and the detectives have not had an opportunity to explain their actions and motivations. Therefore, we have no evidence regarding their subjective intent. (See *People v. Gurule, supra*, 28 Cal.4th at p. 603.) But, unlike in *Seibert*, no evidence suggests that the Los Angeles Police Department, or the individual detectives here, had a policy of withholding *Miranda* warnings to draw out a confession. (See *Krebs, supra*, 8 Cal.5th at p. 310.)

Nor do we think it is reasonable to infer that the detectives purposefully withheld the advisements as part of a "calculated plan to elicit incriminating facts," as Saucedo repeatedly asserts. There was little overlap between the pre- and post-advisement

30

portions of the interview.  With the exception of the few questions regarding Saucedo's gang affiliation and tattoos, the pre-advisement portion of the interview was devoted entirely to biographical data, such as Saucedo's name, address, birthdate, and the like.[9]  Crucially, the pre-advisement portion was wholly incomplete in regard to the circumstances of the charged crimes. The detectives asked no questions regarding the crime itself. Saucedo admitted his involvement in the murder only *after* being advised of his rights; he did not let " 'the cat out of the bag' " during the unwarned portion of the interview.  (See *People v. Williams*, *supra*, 49 Cal.4th at p. 448; *Krebs*, *supra*, 8 Cal.5th at p. 312.)  It is true that the detective briefly confirmed Saucedo's gang affiliation at the start of the warned portion of the interview, but there is no showing he used the earlier admission to induce Saucedo to admit involvement in the murder.  (See *Bobby v. Dixon* (2011) 565 U.S. 23, 31 ["unlike in *Seibert*, there is no concern here that police gave [defendant] *Miranda* warnings

---

[9]     The People argue that Detective Rodriguez likely failed to give *Miranda* advisements earlier because, at the time, the "booking exception" to *Miranda* allowed a suspect to be asked routine questions about biographical data before being given *Miranda* warnings.  (See *Elizalde*, *supra*, 61 Cal.4th at pp. 531–532; *People v. Roberts* (2017) 13 Cal.App.5th 565, 573–574.) Saucedo counters that the booking exception was inapplicable because the detectives were not questioning him as part of the booking process.  (See *People v. Shamblin* (2015) 236 Cal.App.4th 1, 22 [whether booking exception applies depends on whether the questions are legitimate booking questions or a pretext for eliciting incriminating information].) We need not address this issue because, regardless of the booking exception's applicability, we see no evidence the detectives purposely used the impermissible two-step procedure.

and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat"].) And, the mere fact the detectives *could* have given the advisements earlier does not demonstrate a calculated plan to undermine *Miranda.* (*Krebs*, at p. 312.)

Moreover, the detectives had already examined Saucedo's phone. Therefore, they would have been aware that it contained photos depicting Saucedo throwing gang signs, one with a caption "Christian Suspect Fulton Locos MSX3." Saucedo also had clearly visible "M" and "S" tattoos. Thus, the detectives would have surmised they could rather easily prove Saucedo's gang affiliation, whether he admitted it or not. Had the detectives been operating pursuant to a calculated "ask first, warn later" procedure, it seems unlikely they would have curtailed this effort after obtaining information only on an aspect of the case that would have been easily provable apart from Saucedo's admission.[10]

C. *The alleged* Seibert *violation: the plurality's test*

"Under the plurality's approach, the relevant inquiry in a 'question first' scenario is 'whether it would be reasonable to find completeness . . . that in these circumstances the warnings could function "effectively" as *Miranda* requires.' [Citation.] In other words, '[c]ould the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?' [Citation.]" (*Krebs*,

---

[10] Because we conclude the use of the two-step procedure was not a purposeful attempt to circumvent *Miranda*, we do not reach the issue of whether curative measures were taken.

32

*supra*, 8 Cal.5th at p. 309.) Factors relevant to this determination are " 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.' " (*Id.* at p. 310.)

Unquestionably, here the *Miranda* advisements functioned effectively, giving Saucedo a real choice about keeping silent. There was minimal overlap between the pre- and post-advisement discussions. The initial portion of the interview was not simply incomplete in regard to the murder; it did not address it at all. Saucedo was not asked about, and gave no information about, the actual crime. He was not asked about, and did not admit knowing or spending time, with Alvarado, Tobar, or Ruiz. He did not discuss any of his actions on the date of the murder. His only incriminating admission was that he was a gang member. This fact, by itself, did little or nothing to link him to the charged crimes.

In sum, Saucedo's *Miranda* challenges lack merit.

2. *Sufficiency of the evidence*

Saucedo raises two challenges to the sufficiency of the evidence. First, he avers the evidence was insufficient to support the jury's true findings on the gang enhancements (§ 186.2, subd. (b)). Second, he argues that the evidence failed to establish he committed criminal street gang conspiracy (§ 182.5).

a. *Standard of review*

To determine whether the evidence was sufficient to sustain a criminal conviction or an enhancement, " ' "we review the entire record in the light most favorable to the judgment to

33

determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) Reversal is unwarranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the verdict. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

> b. *The gang enhancement*

> (i) *The pattern of criminal gang activity element*

Section 186.22, subdivision (b)(1), enacted as part of the California Street Terrorism Enforcement and Prevention Act (the STEP Act), imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Prunty* (2015) 62 Cal.4th 59, 66–67 (*Prunty*); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.) The prosecution may rely on expert testimony to prove the elements of the gang enhancement. (*People v. Garcia* (2017) 9 Cal.App.5th

34

364, 375–376; *People v. Weddington* (2016) 246 Cal.App.4th 468, 483.)

Saucedo challenges only the sufficiency of the evidence to establish the third element, the pattern of criminal gang activity. A "pattern of criminal gang activity" is defined as the "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" specifically enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e); *People v. Duran*, *supra*, 97 Cal.App.4th at p. 1457.) These prior offenses have come to be known as "predicate offenses." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 402.)

In *Prunty*, our Supreme Court held that "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Prunty*, *supra*, 62 Cal.4th at pp. 67–68.)  There, the prosecution's theory was that the defendant committed an assault to benefit the Sacramento-area Norteño street gang. Prunty identified as a Norteño, claimed membership in a particular Norteños subset, the Detroit Boulevard Norteños, and said "Norte" when committing the crime.  (*Id.* at p. 67.)  To prove the gang enhancement, the expert testified about the Sacramento-area Norteño gang's general existence and origins, use of shared signs, symbols, colors, and names, and its primary

activities. (*Ibid.*) To prove the pattern of gang activity, the expert testified about the "predicate activities of two local neighborhood subsets," the Varrio Gardenland Norteños and the Varrio Centro Norteños. (*Id.* at pp. 67, 69.) Other than the fact these subsets referred to themselves as Norteños, the expert did not offer "any specific testimony contending that these subsets' activities connected them to one another or to the Sacramento Norteño gang in general." (*Ibid.*)

In reversing the gang enhancement for insufficient evidence, *Prunty* found the prosecution had failed to prove the existence of a "single 'criminal street gang' " and establish an "associational or organizational connection" between the two subsets that committed the predicates and the larger Norteño gang that Prunty's crime was intended to benefit. (*Prunty*, *supra*, 62 Cal.4th at pp. 68, 81.) The court explained that when "the prosecution's case positing the existence of a single 'criminal street gang' . . . turns on the existence and conduct of one or more gang subsets, . . . the prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at p. 71.) *Prunty* recognized, however, that an informal group "will rarely if ever" display the attributes of formal groups; they "need not exhibit an identifiable hierarchy; their membership composition may be fluid; the boundaries of their 'turf' may be porous; and their methods of communication may be variable." (*Id.* at pp. 73–74.)

*Prunty* listed numerous potential avenues by which the prosecution could make this showing. "That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part

36

of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization. [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22(b)." (*Prunty*, *supra*, 62 Cal.4th at pp. 71–72, fns. omitted, 77–81.) Evidence of a common name, identifying symbol, color, common enemy, or "loose common ideology," are, by themselves, insufficient to prove such a connection between subsets, as is evidence that a local subset represented itself as an affiliate of a larger organization absent a showing that a connection exists in fact. (*Id.* at pp. 72, 74–75, 79.)

(ii) *The evidence was sufficient*

Here, Officer Jara testified about two "predicate" offenses. In the first, MS-13 gang member Edwin Lobos committed robbery in March 2013 and was convicted of that offense in July 2013. Known as "Gangster" or "Sonny," Lobos was a member of the Harvard Criminals MS-13 clique.

In the second predicate, MS-13 gang member Brayan Ochoa committed attempted murder in July 2013 and was convicted of that crime in March 2015. During cross-examination, defense counsel elicited that Ochoa belonged to the Adams Locos MS-13 clique.

Additionally, the jury was instructed that, if it found Saucedo guilty of "a crime in this case, you may consider that crime in deciding whether . . . a pattern of criminal gang activity has been proved."

Saucedo argues that, as in *Prunty*, the prosecution failed to show the requisite organizational or associational connection between MS-13, his Fulton Locos clique, and the cliques that committed the predicate offenses, i.e., the Harvard Criminals and the Adams Locos. We disagree, and conclude the evidence was sufficient.[11]

The evidentiary deficiency present in *Prunty* does not exist here. Officer Jara's testimony established a sufficient associational and organizational connection between the overarching MS-13 gang and its Los Angeles-area subsets. When asked to describe "the interaction or the relationship between" the different MS-13 cliques, Officer Jara stated: "They're all under one umbrella. They're just different areas. They get together to have meetings because, in the end, they're all responsible for pitching in to the gang. So they have to have some kind of communication amongst each other." Gang members "absolutely" share information regarding their activities and borders, as well as knowledge about rival gangs. (See *Prunty*, *supra*, 62 Cal.4th at pp. 78–79 [evidence showing subset members "have communicated, worked together, or share

---

[11] The People argue *Prunty* is inapplicable because the prosecution's theory was based on the conduct of MS-13 as a whole, not on the conduct of any particular subset. (See *People v. Vasquez* (July 27, 2021, F078228) __ Cal.App.5th __ [2021 Cal.App.Lexis 606].) We assume *Prunty* applies and, in light of our conclusion that the evidence was sufficient, do not reach the People's contention.

a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang"].)

Jara had investigated crimes in which MS-13 gang members from different cliques acted together. (See *Prunty*, *supra*, 62 Cal.4th at p. 78 [evidence that members of different subsets have worked in concert to commit a crime permits the inference that the subsets have some sort of informal relationship; such evidence "need not be direct, and it need not show frequent communication or a hierarchical relationship among the members who communicate"]; *People v. Garcia*, *supra*, 9 Cal.App.5th at p. 377; *People v. Vasquez* (2016) 247 Cal.App.4th 909, 925.) For example, in the charged offenses, Ruiz (Fugitivo) was a member of the Normandie Locos MS-13 clique, and "Blackie," the woman who gave Saucedo her sweater, was from the Rosario clique. There was also evidence members of different cliques "hung out" and socialized together. "Espanto"—who was a member of the same Adams clique as Ochoa—accompanied Saucedo and his fellow gang members to the beach. (See *Prunty*, *supra*, 62 Cal.4th at p. 78 ["Even evidence of more informal associations, such as proof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture."]; *Vasquez*, at pp. 924–925 [photos showing members of two Norteño subsets together, and evidence subset members attended funeral of Norteño member, showed association with the larger Norteño gang as a whole].)

Jara testified that, due to the gang's hierarchy, the different cliques had a common goal. The cliques did not operate independently, or according to separate agendas. There were "general principles that govern[ed] the gang," and the various cliques did not operate independently of the other cliques. Instead, there was evidence their actions were coordinated. Jara explained that in his experience, when officers remove "almost a whole group, other cliques will come here from different parts of the city to put in work in that spot." In 2014, a member of the Hollywood Locos clique was in charge of the Fulton Locos clique. There were no rivalries between MS-13 cliques. And, as part of an overarching MS-13 policy, clique members were not allowed to obtain MS-13 tattoos until they put in work for the MS-13 gang. (See *Prunty*, *supra*, 62 Cal.4th at p. 77 [evidence subsets are governed by the same " 'bylaws' may suggest that they function— however informally—within a single hierarchical gang"].) And, of course, the fact Saucedo had both MS-13 and Fulton Locos tattoos demonstrated a connection between MS-13 and Saucedo's clique. (See *People v. Garcia*, *supra*, 9 Cal.App.5th at p. 379 [defendant had tattoos of both the overarching gang's name and his subset, amounting to a "corporeal representation of the association between the gang and one of its subsets"].)

Saucedo argues that Jara's testimony about communication between the MS-13 gang and the subsets was "completely discredited on cross-examination" and was speculative. We do not agree; and in any event in evaluating the sufficiency of the evidence, this court does not weigh credibility or resolve evidentiary conflicts. (*People v. Penunuri*, *supra*, 5 Cal.5th at p. 142 [" ' "[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for

40

it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' "]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 51 [doubts about the credibility of witness should be left for the jury's resolution].)

In sum, the evidence presented showed that the MS-13 gang and its subsets are all the same unitary gang, and the "group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Prunty*, *supra*, 62 Cal.4th at p. 81.) Unlike in *Prunty*, the evidence presented here showed more than a common name, symbol, color, or ideology.

Saucedo also argues that CALCRIM No. 1401, the pattern jury instruction given on the gang enhancement, was inadequate because it did not set forth the "requirement of collaboration, association or relationship between the subsets and MS." We disagree. The instruction tracked the language of the statute. (See *Krebs*, *supra*, 8 Cal.5th at p. 331 [the language of a statute is generally an appropriate and desirable basis for an instruction and is ordinarily sufficient when the defendant fails to request amplification].) Saucedo did not request clarifying or amplifying language and therefore has forfeited any claim of instructional error. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 876–877 [party may not complain on appeal that an instruction was too general or incomplete without first requesting clarification at trial].)

c. *The criminal street gang conspiracy charge*

We turn next to Saucedo's contention that the evidence was insufficient to support his conviction for the substantive crime of criminal street gang conspiracy.

Section 182.5, enacted in 2000 by Proposition 21, "created a new form of conspiracy distinct from the traditional understanding of the crime and was intended to ' "expand[ ] the law on conspiracy to include gang-related activities." ' [Citation.]" (*People v. Abbate* (2020) 58 Cal.App.5th 100, 108; *People v. Johnson* (2013) 57 Cal.4th 250, 261; *Elizalde, supra*, 61 Cal.4th at p. 539.) Section 182.5 provides, in pertinent part: "any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, *with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22*, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (Italics added.)

Here, Saucedo does not challenge the sufficiency of the evidence to prove the active participation and willful promotion elements of the crime.[12] However, he contends that the evidence was insufficient to prove the knowledge element. As discussed *ante*, section 186.22, subdivision (e) defines "pattern of criminal gang activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of" over thirty specifically enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons. . . ."

---

[12] Accordingly, we do not address the evidence on these elements.

42

For well over two decades, California courts have delineated the parameters of section 186.22, subdivision (e)'s "pattern of criminal gang activity" element.  (See *People v. Zermeno* (1999) 21 Cal.4th 927, 930; *People v. Gardeley* (1996) 14 Cal.4th 605, disapproved on another ground by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)  Because section 182.5 expressly incorporates section 186.22, subdivision (e), we look to those authorities here.

A pattern of criminal gang activity may be proved by evidence of two or more predicate offenses committed on separate occasions, *or* by evidence of such offenses committed by two or more people on the same occasion.  (*People v. Loeun* (1997) 17 Cal.4th 1, 10; *People v. Garcia* (2020) 46 Cal.App.5th 123, 165–166; *People v. Miranda* (2016) 2 Cal.App.5th 829, 841.)  The charged crime may serve as a predicate offense, as may evidence of defendant's own conduct in the current or a prior offense.  (*People v. Tran* (2011) 51 Cal.4th 1040, 1046; *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 402; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 586; *Miranda*, at p. 840; *People v. Duran*, *supra*, 97 Cal.App.4th at p. 1457.)  A fellow gang member's commission of a crime contemporaneous with the charged crime may establish a second predicate.  (*Loeun*, at pp. 5, 10, 14; *Miranda*, at p. 840.)  "The predicate offenses need not themselves be ' "gang related." ' [Citation.]" (*Garcia*, at p. 165; *Thompkins*, at p. 403; *People v. Gardeley*, *supra*, 14 Cal.4th at pp. 610, 624–625 & fns. 10 & 12.)  Proof of a conviction is not necessary; proof of commission of the offense will suffice.  (*Thompkins*, at p. 403; *People v. Garcia* (2014) 224 Cal.App.4th 519, 524; *People v. Lara* (2017) 9 Cal.App.5th 296, 332; *In re Leland D.* (1990) 223 Cal.App.3d 251, 258.)

Saucedo argues the knowledge element is unsatisfied unless he knew of the specific predicates offered by the People. i.e., the crimes committed by Ochoa and Lobos. He is incorrect. When construing a statute, we must determine the Legislature's intent so as to effectuate the law's purpose. We begin with an examination of the statute's words, giving them their usual and ordinary meaning. (*People v. Colbert* (2019) 6 Cal.5th 596, 603; *People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.) If not ambiguous, the plain meaning of the statutory language controls, and we need go no further. (*Colbert*, at p. 603; *Ruiz*, at p. 1106.) "We apply the same rules of construction to statutes adopted by the voters as to statutes adopted by the Legislature." (*People v. Valencia* (2021) 64 Cal.App.5th 641, 646.)

Section 182.5 nowhere contains such a requirement. Its plain language indicates that a defendant's knowledge of any two qualifying predicate crimes will suffice. Thus, while a defendant's knowledge of the predicates offered by the People would meet the requirement, this is not the only route by which the knowledge element can be proven: if the evidence shows the defendant knew of two qualifying offenses, the requirement is met. Thus, while we agree with Saucedo that there was no evidence he knew of the Lobos and Ochoa convictions, this does not demonstrate insufficiency. On the other hand, to the extent the People suggest the knowledge element is satisfied when a defendant merely knows that a gang generally commits crimes, we disagree. As we have discussed, the definition in section 186.22, subdivision (e) has a well-developed and specific meaning, and requires knowledge of the offenses enumerated in section 186.22, within the statutorily mandated time frame.

44

Here, the evidence was sufficient to prove one predicate. Saucedo's conduct in the current offense established he knew of one enumerated offense, murder, within the relevant time period. As noted, the charged crime may serve as a predicate offense. (See, e.g., *People v. Miranda, supra*, 2 Cal.App.5th at p. 840.) Where a defendant personally commits a qualifying crime, section 182.5's knowledge element is satisfied. In *People v. Johnson*, for example, the requisite knowledge existed because the defendants personally committed several gang-related murders and other crimes. (*People v. Johnson, supra*, 57 Cal.4th at p. 267 ["There was also little question from defendants' conduct that they had the requisite knowledge of [the gang's] pattern of criminal gang activity, having committed much of it themselves."].) And, Saucedo's jury was instructed that the charged murder could be considered in deciding whether the pattern of criminal gang activity existed.

The problem for the People is that there was insufficient evidence of a second crime necessary to establish the pattern of "two or more" offenses, as required by section 186.22, subdivision (e). As noted, the requisite pattern can "be established by evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member." (*People v. Loeun, supra*, 17 Cal.4th at pp. 5, 10, 14; *People v. Miranda, supra*, 2 Cal.App.5th at p. 840 ["[t]he prosecution may 'rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member.' "].) But, that principle does not assist the People here. Where a perpetrator commits a crime and a fellow gang member simply aids and abets that crime, for purposes of section 186.22,

45

subdivision (e), only one, not two, predicate offenses are shown. (*People v. Zermeno, supra,* 21 Cal.4th at pp. 928–929, 931–932 [defendant committed aggravated assault and fellow gang member aided and abetted by preventing victim's friends from coming to his aid; defendant's and aider and abettor's combined activity was a single offense for purposes of section 186.22, subdivision (e)].) Thus, the prosecution could not rely on Alvarado's commission of the murder as a second predicate here.

Nor can the People rely on the fact Saucedo admittedly knew Tovar was an MS-13 gang member, and had a firearm concealed in the truck, under the seat. This circumstance could have established that Tovar was carrying a concealed firearm in violation of section 25400, an offense which is one of the enumerated crimes in section 186.22, subdivision (e). But the jury was never informed that this conduct could qualify as establishing the pattern of criminal gang activity. "Thus, as far as the jur[y] knew," this offense "was not a predicate offense and could not have been used to satisfy the predicate offense requirement." (*People v. Lara, supra,* 9 Cal.App.5th at p. 331, and authorities cited therein.)

Certainly, like its other elements, section 182.5's knowledge requirement may be proved circumstantially (see *People v. Carr* (2010) 190 Cal.App.4th 475, 489–490), and the People argue that was true here. They point out that Saucedo already had one tattoo when the murder was committed, and MS-13 does not allow members to obtain such tattoos unless they have done "something for the gang." But Officer Jara testified that going into a rival gang area and tagging could be enough to earn a gang member a tattoo. This conduct would not necessarily constitute the enumerated offense of felony vandalism, which requires

46

damage of $400 or more.  (See §§ 186.22, subd. (e)(20), 594, subd. (b)(1).)  The evidence showed Saucedo was an MS-13 gang member who spent time with his fellow gang members, and Jara testified that gang members share information regarding their activities.  But Saucedo told police he had only been in the gang for three months, and no evidence suggested a longer tenure.  There was no showing of any particular crimes committed by MS-13 during those three months, or by Saucedo's particular associates during that time, undercutting any inference that he discussed any with his associates.  Nor was there evidence that there was an ongoing gang war during that period, which might have alerted Saucedo that specific qualifying offenses had transpired.  In short, there was no concrete evidence suggesting Saucedo would have been privy to specifics about the gang's crimes.  (Contrast *People v. Carr, supra*, 190 Cal.App.4th at pp. 488–489 [evidence sufficient to prove knowledge for purposes of analogous statute where, inter alia, there was an ongoing gang feud that had resulted in several shootings and was reflected in local graffiti, the murders occurred in the gang's territory, and the defendant had a previous conviction for possession of cocaine for sale].)  We cannot simply assume that because Saucedo was a recent initiate into a violent and notorious gang, that he was automatically aware of qualifying offenses within the meaning of section 186.22, subdivision (e).  To do so would eviscerate section 182.5's knowledge element.

Because the evidence was insufficient, the conviction must be reversed and the matter remanded for a full resentencing.  (See, e.g., *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1259.)

3. *Prosecutorial misconduct*

Saucedo contends the prosecutor committed prejudicial misconduct during argument.  We disagree.

a. *Applicable legal principles*

"In California, the law regarding prosecutorial misconduct is settled: 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'  [Citation.]" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052.)  When a claim of misconduct is based on the prosecutor's arguments before the jury, we consider whether there is a reasonable likelihood the jury construed or applied the challenged remarks in an objectionable fashion.  (*People v. Adams* (2014) 60 Cal.4th 541, 568.)  We consider the statements in context, and view the argument and instructions as a whole.  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

b. *Argument that jurors should "do the right thing"*

At the end of his closing argument, the prosecutor discussed the evidence and reasonable inferences to be drawn therefrom.  He then concluded:  "So don't think for one moment, ladies and gentlemen, that this was some kind of freak thing that Mr. Saucedo didn't know was going to happen.  We know that from Mr. Saucedo himself and the actions of all of his co-participants.  [¶]  So, please, ladies and gentlemen, do the right thing.  Find the defendant guilty."  Defense counsel's objection

that the argument was improper was overruled.  The prosecutor continued: "Do the right thing, ladies and gentlemen.  Find the defendant guilty of first degree murder, which is what he's guilty of and what we have proven beyond a reasonable doubt."

Saucedo argues that the prosecutor's statements that the jury should "do the right thing" improperly expressed his personal opinion and implied that his conclusions had been " 'validated by the government's investigatory apparatus.' "  He is incorrect.  In context, the comments amounted to nothing more than an argument that the evidence showed Saucedo's guilt, and accordingly the jury should find him guilty.  There was nothing objectionable about this argument.  (*People v. Seaton* (2001) 26 Cal.4th 598, 663 [prosecutor's argument that "the only just verdict was to convict defendant of special circumstances murder, because it is 'the only right thing to do in this case' and because '[h]e did it' " was "fair commentary on the evidence presented"]; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 781–782, disapproved on another ground by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2 [expressions of belief in defendant's guilt are not improper if the prosecutor makes clear the belief is based on the evidence before the jury].)

Saucedo cites various federal authorities in support of his contentions, but they do not assist him.  (*United States v. Young* (1985) 470 U.S. 1, 5, 17–19; *United States v. Nobari* (9th Cir. 2009) 574 F.3d 1065, 1077–1078; *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1146; *United States v. Kerr* (9th Cir. 1992) 981 F.2d 1050, 1051–1053; *United States v. McKoy* (9th Cir. 1985) 771 F.2d 1207–1212.)  Unlike the arguments in those cases, here the prosecutor's statements did not reference matters outside the record, did not vouch for the prosecution's witnesses,

did not imply the prosecutor was privy to information not presented at trial, did not suggest that jurors should convict for external policy considerations or to alleviate social problems, did not appeal to the jurors' passions or prejudices, and cannot be read as an assertion of his personal opinion about Saucedo's guilt unconnected to the evidence.

Saucedo's citation of *People v. Sanchez* (9th Cir. 2011) 659 F.3d 1252, does not assist him because that case bears no resemblance to this one. In *Sanchez*, a drug trafficking case, the defendant presented a duress defense. In closing, the prosecutor argued that accepting the duress defense would be the equivalent of " 'send[ing] a memo' " to drug traffickers that a claim of duress would allow them to "get away with it." (*Id*. at p. 1256.) This argument was improper because it urged the jury to convict for reasons wholly irrelevant to the defendant's guilt or innocence. (*Id*. at p. 1257.) In contrast, the prosecutor here argued only that the jury should convict based on the evidence; he did not state or imply that the jury should convict to further some societal goal. Under no stretch of the imagination can the prosecutor's comments be understood as "a policy argument against acquittal," as Saucedo argues.

In any event, even had the prosecutor's brief statements been flawed—a finding we do not make—they were manifestly harmless. (See *People v. Medina* (1995) 11 Cal.4th 694, 759–760 [argument that jury should " 'do the right thing, to do justice, not for our society necessarily or exclusively, but for [the victim],' " were brief and isolated and could not have influenced the jury's guilt determination].)

c. *Reference to the prosecutor's duty*

During his closing argument, defense counsel argued that the prosecution's reliance on multiple theories of murder indicated the weakness of the People's case and showed the prosecutor was trying "to pull that wool over your eyes." Addressing the defense argument, in closing the prosecutor stated: "This is a murder case, ladies and gentlemen. The People of the State of California are asking you to convict Mr. Saucedo of the most serious crime on the books: first degree murder. It is my duty as a representative of the State of California to present the evidence. It is my duty as a representative of the People of the State of California to present the law to you, through, of course, the judge. [¶] So when the defense then says that I'm trying to say something about my case, that my case is weak because I am giving you applicable law in this case is also offensive. And as jurors, you should want all of the facts that you can get before making this kind of decision and all of the applicable law in this case before making your decision. That is what I'm doing. [¶] There are different ways that people can be found guilty. I didn't make these laws, ladies and gentlemen. I'm simply giving them to you because they're applicable in this case."

Saucedo argues that the prosecutor improperly used the prestige of his office to "vouch[ ] for himself" and bolster his own credibility; referenced matters outside the record, i.e., his own experience; and denigrated defense counsel by casting aspersions on his character and integrity. He is incorrect.

Defense counsel did not object to the challenged statements, and therefore Saucedo's claim has been forfeited. A claim of prosecutorial misconduct is forfeited when there was

51

neither a timely and specific objection nor a request for an admonition. (*People v. Powell* (2018) 6 Cal.5th 136, 182; *People v. Centeno*, *supra*, 60 Cal.4th at p. 674.) Nothing suggests an objection here would have been futile. In light of this forfeiture, Saucedo contends his attorney provided ineffective assistance. We have set forth the relevant principles regarding such a claim *ante*. We detect no ineffective assistance.

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.] Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[ ] to make the prosecutor his own witness— offering unsworn testimony not subject to cross-examination." ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480; *People v. Bonilla* (2007) 41 Cal.4th 313, 336 [it is misconduct for prosecutors to bolster a case by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office].)

Defense counsel did not err by failing to object because, in context, the challenged statements were not improper. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90.) The prosecutor simply argued, in response to the defense argument, that the People were not attempting to trick the jury or "pull the wool" over jurors' eyes by advancing several theories of guilt; instead, the prosecutor was offering several theories because the evidence

warranted it. The prosecutor's statements—that he had the duty to present evidence to prove guilt under the law as given by the court—was accurate. And these statements did not reference information outside the record. The jury was instructed that "the People" had the burden to prove guilt beyond a reasonable doubt based on the evidence presented at trial and the instructions given by the court. (CALCRIM Nos. 200, 220.) Nothing about the challenged argument suggested that the prosecutor possessed evidence outside the record that supported his theories.

Nor did the prosecutor's comments vouch for the strength of his case by invoking his personal prestige, reputation, or experience, or the prestige of his office. We cannot see how the statement that the prosecutor—the representative of the state—had the burden to prove guilt implicitly referenced the prestige of the prosecutor's office. The prosecutor did not state or imply that he was more trustworthy or experienced than defense counsel. (Contrast *People v. Huggins* (2006) 38 Cal.4th 175, 207 [prosecutor may not reference his "own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried"].)

Saucedo's argument that the prosecutor disparaged defense counsel fares no better. It is of course misconduct to disparage defense counsel or attack his integrity (*People v. Bell* (1989) 49 Cal.3d 502, 538), but the prosecutor did not do so here. "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47, abrogated on other grounds by *People v. Merritt* (2017) 2 Cal.5th 819, 831; see *People v. Valencia* (2008) 43 Cal.4th 268,

305 [vigorous denigration of the defense case is the prosecutor's right as an advocate]; *People v. Seaton, supra,* 26 Cal.4th at p. 663 [prosecutor's argument that the defense case was ludicrous, contrived, concocted, and bogus did not impugn counsel's integrity]; *People v. Medina, supra,* 11 Cal.4th at p. 759 [argument that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something' " did not amount to an attack on counsel's integrity].)

Nor was the prosecutor's use of the word "offensive" to describe the defense argument misconduct. In *People v. Medina, supra,* 11 Cal.4th 694, 759, the prosecutor "expressed some indignation over defense counsel's 'patently offensive' remark that there were no eyewitnesses to the murder." Our Supreme Court found this was a fair comment on the evidence. (*Ibid.*) In any event, even assuming arguendo that the prosecutor's use of the word "offensive" was ill-advised, this single comment cannot be said to have infected the trial with unfairness or constituted a deceptive or reprehensible method of persuasion.[13]

---

[13] Saucedo makes a variety of assertions about what the prosecutor's comments really meant, including the following: (1) The prosecutor was held to a higher standard than defense counsel and "wasn't just some paid hack attorney representing criminals, but instead, he was '(cue the Superman music) a representative of the People of the State of California.' " (Capitalization omitted.) (2) "Defense counsel is just some shill, some hired gun to represent a scummy defendant. I am right. He is wrong. Listen only to what I say because 'it is my duty . . . .' " (3) The prosecutor "wrap[ped] himself in the flag" and claimed to be "above the defense, better than the defense, more pure than the defense, more right than the defense—because the prosecutor does what he does based on 'duty,' or based on his

d. *Argument on uncharged conspiracy to murder*

Saucedo next contends the prosecutor committed misconduct by arguing conspiracy to commit murder as a theory of guilt, although the jury was not instructed on that theory. We conclude the error was harmless.

(i) *Additional facts*

Just prior to argument, the prosecutor informed the court he intended to argue, as a theory of murder liability, uncharged conspiracy to murder. Defense counsel objected on various grounds. The court concluded circumstantial evidence supported the conspiracy to murder theory.

Thereafter, in addition to direct aiding and abetting and premeditated first degree murder, the court instructed the jury on a different theory of uncharged conspiracy that the parties had discussed, i.e., that Saucedo could be convicted of murder or voluntary manslaughter if he conspired to commit simple battery and murder or voluntary manslaughter was a natural and probable consequence of such battery. It did not instruct on uncharged conspiracy to commit murder.

During opening argument, the prosecutor argued that Saucedo could be guilty of murder even though he was not the shooter, based on a conspiracy theory. He argued: "A member of a conspiracy is criminally responsible for the crimes that he conspires to commit, no matter which member of the conspiracy

position within the Government. . . ." (4) The prosecutor was the jury's representative, while defense counsel was a "[p]aid hitman." The problem with these colorful and imaginative assertions is that they bear no resemblance whatsoever to the prosecutor's actual words, express or implied. No juror could possibly have gleaned these meanings as an implied subtext underlying the prosecutor's comments, nor do we.

commits the crime." "Conspiracy is basically two people get together and agree to do a murder. . . . You do not have to kill somebody in conspiracy. You don't have to aid and abet the murder with conspiracy. What we have to show is an agreement between the parties. [¶] . . . You can find an agreement from the actions of the people that they had an agreement to kill Mr. Rubio."

Between the defense closing and prosecutor's rebuttal, the prosecutor informed the court that due to an oversight, he had failed to request, and the jury had not been given an instruction on, conspiracy to commit murder as a theory of liability. The court observed that the prosecutor's argument correctly stated the law. Nonetheless, the court was not inclined to add an instruction on uncharged conspiracy to murder at that point. The prosecutor obtained permission from the court to continue arguing the theory in his rebuttal argument, but did not actually do so.

During deliberations, the jury sent the court a note asking, "Can we get an itemized list of the criteria that would define Murder 1, Murder 2 and involuntary manslaughter?" The court gave a lengthy response.[14] As relevant here, the court informed the jury that in regard to the conspiracy instructions, "what you have to determine is whether or not there was a conspiracy. . . . Unless the conspiracy was to commit murder, that was the crime that they conspired to do, then you have to look at [CALCRIM No.] 417 and determine whether or not in this case they conspired to commit the offense of a battery. . . . [¶] Now, if what you find is they didn't conspire to commit murder, they conspired

---

[14] We discuss the court's answer to the question in more detail where relevant *post*.

56

to commit battery, then the defendant is only guilty if the murder was in the furtherance of the conspiracy, it was committed in order to further the battery and, secondly, that it was a natural and probable consequence of the commission of the battery.  [¶] . . . . It has to be both.  [¶]  If the answer to both those questions is yes, then it's second degree murder or voluntary manslaughter. It cannot be first degree murder. . . . Because in order for it to be first degree murder, . . . the defendant had to have shared an intent to kill."

   (ii)  *Discussion*

  Saucedo complains that the prosecutor's argument "misled the jury in an objectionable fashion, i.e., so as to improperly convict him of murder," and the trial court erred by failing to "take any ameliorative steps."  Therefore, he asserts, he was deprived of a fair trial and his murder conviction must be reversed.  The People argue that the claim is forfeited for failure to object, but in any event, any error was harmless under any standard.  We agree with the People's latter argument.

  Contrary to Saucedo's argument, the conspiracy to murder theory was not legally erroneous; as defense counsel conceded below and the trial court found, the theory was legally sound. Nor was it factually unsupported.  Thus, this is not a case in which the prosecutor misstated the law or the facts.  The prosecutor admitted he erred by failing to request the instruction. But, in light of the trial court's answer to the jury's query and the other instructions given, his misstep was manifestly harmless. The court clearly explained that if the jury found Saucedo conspired to murder Rubio, the offense would be first degree murder.  The jury acquitted Saucedo of first degree murder and convicted him of second degree murder, making it clear beyond a

reasonable doubt that it did not rely on the conspiracy to murder theory. Accordingly, the prosecutor's error is harmless under any standard. (*Chapman v. California, supra*, 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 ["we do not reverse a defendant's conviction because of prosecutorial misconduct unless it is reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct"].) In light of the verdict, Saucedo fails to show any violation of his fair trial and due process rights.

      4. *Jury deliberations*

         a. *Additional facts*

As noted, during deliberations the jury sent a note to the court requesting "an itemized list of the criteria that would define Murder 1, Murder 2 and involuntary manslaughter?" After discussing the note with the parties, the court told the jury: "I can't give you a list, but what I'm going to do is go through— because I gave you the instructions. The criteria for each type of offense are laid out in those instructions. But what I'll do is . . . I'll give you the list of instructions to look at for what." The court suggested that the jury should first determine whether Alvarado committed a murder, a manslaughter, or acted in perfect or imperfect self-defense, and referred the jury to the relevant instructions. The court advised that if the jury found the killing was lawful, "you're finished. . . . Because then it wasn't murder at all." If the jury determined the killing was unlawful, it then needed to determine whether Saucedo was liable and for what offense, by considering the instructions on aiding and abetting, natural and probable consequences, conspiracy, withdrawal from the conspiracy, and other instructions. The court summed up, "I

58

hope this is helpful, but the criteria are there.  You've got them in your hands."  The court offered to provide further explanations about individual instructions.

Defense counsel did not object, other than to reiterate, prior to the court's response to the jury, his previously stated position that the instruction on battery as a target offense of the conspiracy was illogical.

b. *Discussion*

Saucedo contends the trial court's response improperly interfered with the jury's deliberations, invaded the jury's province, was coercive, and deprived him of his rights to due process and a fair trial.  In his view, the trial court improperly told the jury which instructions it should consider, and in what order.  He avers that notwithstanding the absence of an objection, the issue is cognizable pursuant to section 1259; and, if not preserved, defense counsel provided ineffective assistance.  The People contend that the claim has been forfeited, and is meritless in any event because the court acted within its discretion.  (See *People v. Boyce* (2014) 59 Cal.4th 672, 699; *People v. Dykes*, *supra*, 46 Cal.4th at p. 802.)

When a jury asks a question after retiring for deliberations, section 1138 requires that the court provide information the jury desires on points of law and help it understand the legal principles it is asked to apply.  (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539; *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.)  " ' "This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for

information.  [Citation.]  Indeed, comments diverging from the standard are often risky.  [Citation.]' " (*Montero*, at p. 1179; *People v. Williams* (2015) 61 Cal.4th 1244, 1267.)  On the other hand, a court "must do more than figuratively throw up its hands and tell the jury it cannot help.  It must consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331; *People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  " 'We review for an abuse of discretion any error under section 1138' " (*People v. Hodges*, at p. 539), and review de novo the accuracy of any supplemental instructions provided (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887 & fn. 4).  Reversal is warranted only where prejudice is shown.  (*Beardslee*, at p. 97.)

Assuming arguendo that the claim was preserved for appeal, it lacks merit.  The court simply went over the relevant legal principles and referred the jury to the appropriate instructions.  It did not misstate the law.  Its comments were neutral; it did not act as an advocate in any sense.  (See *People v. Montero*, *supra*, 155 Cal.App.4th at p. 1180 [court must not appear to be an advocate, either endorsing or redirecting the jury's inclination]; *People v. Moore*, *supra*, 44 Cal.App.4th at p. 1331.)  Its comments did not suggest the jury should render any particular verdict, nor did they explicitly or implicitly favor the People.

Saucedo's arguments to the contrary do not persuade us.  He avers that the court "impose[ed] on the jury its own view of the evidence."  It did not; its challenged comments did not reference the evidence.  He contends the court engaged in "argument."  It did not.  Its comments were neutral.  He urges

60

that the court effectively told the jury it could not consider manslaughter before rendering a verdict on murder.  (See *People v. Dennis* (1998) 17 Cal.4th 468, 536 [court may restrict jury from returning a verdict on a lesser included offense before acquitting on a greater offense, but may not preclude it from considering lesser offenses during deliberations].)  It did not; moreover it also instructed, pursuant to CALCRIM No. 640, that the jury could "consider these different kinds of homicide in whatever order you wish."  Contrary to Saucedo's assertions, we see no likelihood that the court's response was coercive.  And assuming for the sake of argument that the court's comments constituted an improper roadmap, Saucedo fails to explain how they somehow prejudiced him.  There was no reversible error.

5.  *Cumulative error*

Saucedo contends that the cumulative effect of the purported errors requires reversal, even if they were individually harmless.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236.)

6.  *Sentencing issues*

a.  *Additional facts*

The jury rendered its verdicts in October 2016.  Due to a series of continuances and resolution of a motion for new trial, sentencing was put off until after passage of Senate Bill 1437.  As relevant here, that statute, which took effect on January 1, 2019, eliminated the natural and probable consequences doctrine as it relates to murder, by adding subdivision (a)(3) to section 188. (See *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)

61

That section now states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid natural and probable consequences theory may petition for vacation of their convictions and resentencing.

In March 2019, defense counsel filed a motion to vacate Saucedo's second degree murder conviction pursuant to the new law, arguing that the jury likely convicted him based on the natural and probable consequences doctrine or as an aider and abettor who lacked the intent to kill, and both theories had been abrogated by passage of Senate Bill 1437.[15] The People opposed the motion on the ground the statute was unconstitutional. They conceded that if the trial court concluded Senate Bill 1437 was constitutional, "the defendant appears eligible for some relief under the newly enacted [section] 1170.95," but if the murder conviction was vacated, Saucedo should nonetheless be sentenced on the target crime of assault with a firearm.

On September 18, 2019, the trial court granted Saucedo's motion. It found Senate Bill 1437 was constitutional and vacated the second degree murder conviction on count 1. It reasoned that Saucedo was not the actual shooter, the jury was instructed on the natural and probable consequences doctrine, and it was not

---

[15] Contrary to defense counsel's apparent argument, Senate Bill 1437 did not do away with an aider and abettor's liability for murder. (*Gentile*, *supra*, 10 Cal.5th at p. 848 ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"].)

possible to determine which theory of murder the jury relied upon when rendering the guilty verdict.

The court then sentenced Saucedo as follows. On count 2, the gang conspiracy charge, it imposed a sentence of 15 years to life in prison, plus one year for the section 12022, subdivision (a)(1) principal-armed allegation. On count 1, it sentenced Saucedo on the target offense of assault with a firearm to the high term of four years, plus five years for the section 186.22 gang allegation, to run concurrently with the sentence in count 2. The court explained it selected the high term "based on the facts and circumstances of the underlying case. This is a gang confrontation that occurred with somebody standing on the corner. Defendants went out of their way to [confront] him with a firearm, and he was shot and killed." The court imposed a restitution fine of $10,000 and rejected Saucedo's request to waive it because he was indigent. It also imposed a criminal conviction assessment and a court security fee on each count. It awarded 1,771 days of actual custody credit and 265 days of conduct credit for a total of 2,036 days.

Saucedo raises a variety of claims related to the sentence imposed. We address them seriatim.

      b. *Vacation of murder conviction pursuant to Senate Bill 1437*

Saucedo argues that no sentence should have been imposed on count 2, criminal gang conspiracy, because the target crime of the conspiracy was murder; the court vacated his murder conviction pursuant to Senate Bill 1437; and battery, a misdemeanor, could not serve as the basis for the section 182.5 conviction because that statute requires felonious conduct. In

63

light of our reversal of his conviction on count 2, these contentions are now moot.

The People argue that the order vacating the murder conviction resulted in an unlawful sentence because Saucedo "never filed a section 1170.95 petition." They point out that the section 1170.95 petitioning procedure is the exclusive avenue of relief under Senate Bill 1437. (*Gentile*, *supra*, 10 Cal.5th at p. 839.) Therefore, they argue, the sentence imposed was unauthorized and the matter should be remanded for resentencing. Because the People appear to attack the propriety of the court's grant of relief under Senate Bill 1437—a question that is not mooted by our conclusion that the conviction in count 2 must be reversed—we briefly address their arguments.

The People are correct that Saucedo failed to strictly adhere to the procedural requisites of section 1170.95. The document he filed was captioned a "motion" rather than a "petition"; it discussed Senate Bill 1437, but did not specifically reference section 1170.95;[16] and it did not include a declaration from Saucedo stating that he was eligible for relief because he was prosecuted under the natural and probable consequences doctrine, was convicted of second degree murder, and could not now be convicted of that offense in light of Senate Bill 1437's amendments to the law. (See § 1170.95, subds. (a), (b).)

But in the trial court, the People clearly understood and accepted that Saucedo was seeking relief pursuant to section 1170.95. The People's opposition opened with the statement that "The People oppose *defendant's petition for resentencing filed under Penal Code § 1170.95 . . . .*" (Italics added.) Saucedo's motion clearly sought relief based on the amendments to the law

---

[16] In his reply, Saucedo expressly referenced section 1170.95.

64

of murder made by Senate Bill 1437. Although the People could have successfully opposed the petition on procedural grounds, they failed to do so; instead, *they conceded* that if Senate Bill 1437 was constitutional, Saucedo was entitled to relief. (See § 1170.95, subd. (d)(2) [parties may waive a resentencing hearing and stipulate that petitioner is eligible to have his murder conviction vacated and for resentencing].) Nor did the People seek review of the trial court's order on the motion. Under these circumstances, the People cannot now be heard to complain that the motion was procedurally defective.

*Gentile* does not assist the People. There, the appellant contended on appeal that Senate Bill 1437 required reversal of his murder conviction, even though he had not sought relief in the trial court via a section 1170.95 petition. (*Gentile*, *supra*, 10 Cal.5th at p. 841.) Under those circumstances, *Gentile* concluded that "the procedure set forth in section 1170.95 is the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal." (*Id.* at p. 839.) Thus, a conviction suffered before Senate Bill 1437's effective date "may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Id.* at p. 852.) Here, Saucedo *did* seek and obtain relief in the trial court, albeit before, rather than after, he was sentenced. To the extent the People suggest a section 1170.95 petition can be filed only after a defendant is sentenced, they cannot raise that argument at this juncture, after failing to oppose or appeal the trial court's order.

Nor is the sentence imposed unauthorized, as the People assert. A sentence is unauthorized when it cannot be lawfully imposed under any circumstance in the particular case. Because

65

imposition of such a sentence exceeds a court's jurisdiction, an unauthorized sentence may be reviewed on appeal despite the absence of an objection below.  (See *People v. Francis* (2017) 16 Cal.App.5th 876, 884; *People v. Rivera* (2019) 7 Cal.5th 306, 348–349.)  But the People have not shown the sentence here is unauthorized.  Saucedo's jury was instructed on the natural and probable consequences doctrine, making him potentially eligible for relief under section 1170.95.  As the People agree, "it is undisputed that appellant 'comes within the ambit' of Senate Bill 1437."  Had the People opposed the motion on procedural grounds, Saucedo could simply have filed a petition that strictly complied with section 1170.95's requisites; his initial failure to do so would not have been a bar to eventual relief.[17]

c. *The section 12022, subdivision (a)(1) enhancement*

The information alleged a section 12022, subdivision (a)(1) principal armed enhancement as to count 1, murder, but not count 2, gang conspiracy.  The jury found true a section 12022, subdivision (a)(1) principal armed enhancement on both counts.  The trial court orally imposed a one-year sentence for the principal armed enhancement on count 2, but not on count 1.  Saucedo contends that because the firearm enhancement was not pled on count 2, it must be stricken.  The People argue that the failure to plead the enhancement was harmless, and Saucedo had

---

[17]    Further, it is not clear why the People think the appropriate remedy is a remand for resentencing.  If the trial court erroneously granted the motion, the remedy would be reversal and reinstatement of the murder conviction, and reconsideration of a new, proper motion pursuant to section 1170.95, not a remand for resentencing.

We offer no opinion on whether the trial court's ruling that Saucedo was entitled to relief was correct.

66

sufficient notice, because the enhancement was pled as to the murder count. Because we have reversed Saucedo's conviction on count 2, the principal armed enhancement attached to that conviction is also reversed. Accordingly, the parties' contentions are moot and we need not address them.

        d. *Imposition of the upper term*

Saucedo complains that the trial court abused its discretion by imposing the upper term of four years on count 1, which, after grant of the motion to vacate, was redesignated as assault with a firearm.

"Sentencing courts have wide discretion in weighing aggravating and mitigating factors." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258.) A trial court is required to state its reasons for its sentencing choice to impose the upper term. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371.) A single aggravating factor will support an upper term sentence. (*Ibid.*) However, a fact that is an element of the crime or the basis for an enhancement cannot be used to impose an upper term. (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1197.)

Pointing to the court's statement that it was imposing the high term based on the "facts and circumstances of the underlying case," including that the murder was a "gang confrontation," Saucedo asserts that the court improperly considered the elements of the offense and the facts underlying the gang enhancement as the basis for the high term sentence. Further, he avers that the reasons given were too general and vague to constitute meaningful, fact-based reasons for the court's sentencing choice.

Saucedo did not object to the sentence on these bases below, and his contentions have been forfeited. (*People v. Scott, supra,*

61 Cal.4th at p. 406 [" 'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial.' "]; *People v. Kidane* (2021) 60 Cal.App.5th 817, 826.)

Saucedo argues that his counsel provided ineffective assistance by failing to object. The People contend that, apart from the reasons the court stated, there was a sufficient basis for its selection of the upper term. We need not further address these contentions because we are remanding for a full resentencing, at which time the parties can advance whatever arguments they wish regarding the appropriate term.

      e. *Correction of the abstract of judgment, minute order, and custody credits*

The parties point to several errors in the abstract of judgment and a minute order.

Saucedo contends the abstract of judgment must be corrected to reflect that his sentence on count 1 was redesignated as assault with a firearm, section 245, subdivision (a)(2). Further, he argues that the minute order incorrectly states that his section 1170.95 motion to vacate the murder conviction was denied. The People agree with both contentions. We agree that the abstract must be corrected to reflect that the murder conviction was redesignated as assault with a firearm and that the minute order, to the extent it is incorrect,[18] must be corrected.

At sentencing, the trial court awarded Saucedo 1,771 days of actual custody credit and 265 days of conduct credit, at a 15 percent rate, for a total of 2,036 days. The abstract of judgment

---

[18] The reporter's transcript provided to this court is missing the cited page upon which this error allegedly appears.

erroneously states a total of 1,347 days, with actual days of 1,171 and conduct credit of 176. Saucedo argues that both totals are incorrect, because his redesignated crime, assault with a firearm, is not subject to the 15 percent limit mandated by section 2933.1. Instead, he avers he is entitled to a conduct credits at the day-for-day rate required by section 4019, subdivision (f), giving him a total of 3,541 days. The People agree that the abstract of judgment should be corrected to reflect the oral pronouncement of judgment. They argue, however, that he is subject to the 15 percent credit limitation because his conviction for criminal street gang conspiracy under section 182.5 is a felony punishable by imprisonment in the state prison for life. (See *People v. Jacobs* (2013) 220 Cal.App.4th 67, 85; § 667.5, subd. (c)(7).) Saucedo disagrees. Given that we are reversing the criminal street gang conspiracy conviction in count 2, the 15 percent limitation does not apply.

Because we are remanding for a full resentencing, the trial court is directed, on remand, to correct the foregoing errors and recalculate Saucedo's custody credits.

## DISPOSITION

The judgment is affirmed in part and reversed in part. Saucedo's conviction for violation of Penal Code section 182.5, and the attached section 12022, subdivision (a)(1) firearm enhancement, are reversed. The matter is remanded for a full resentencing, issuance of a new abstract of judgment, and correction of the minute order, as set forth above. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

THOMAS, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.